**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-2029

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS,

        Plaintiff - Appellant,

    v.

UNITED STATES DEPARTMENT OF AGRICULTURE; SONNY PERDUE, in his official capacity as Secretary of the United States Department of Agriculture,

        Defendants - Appellees.

---------------------------------------

THE FUND FOR ANIMALS; THE HUMANE SOCIETY OF THE UNITED STATES; DELCIANNA J. WINDERS, Academic Fellow, Animal Law & Policy Program, Harvard Law School,

        Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, Chief District Judge. (5:15-cv-00429-D)

Argued: May 10, 2017                                               Decided: June 28, 2017

Before WILKINSON, KEENAN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Wilkinson and Judge Keenan joined.

**ARGUED:** Katherine Anne Meyer, MEYER GLITZENSTEIN & EUBANKS, LLP, Washington, D.C., for Appellant. Matthew Fesak, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Jonathan D. Sasser, ELLIS & WINTERS LLP, Raleigh, North Carolina; Jenni R. James, PETA FOUNDATION, Washington, D.C., for Appellant. John Stuart Bruce, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. Anna Frostic, Laura Friend, Laura Fox, Kim Ockene, THE HUMANE SOCIETY OF THE UNITED STATES, Washington, D.C., for Amici The Humane Society of the United States and The Fund for Animals. John Vail, JOHN VAIL LAW PLLC, Washington, D.C., for Amicus Delcianna J. Winders.

THACKER, Circuit Judge:

People for the Ethical Treatment of Animals ("PETA") challenges the license renewal process for animal exhibitors promulgated by the United States Department of Agriculture ("USDA"), through which the USDA may renew such license despite a licensee's noncompliance with the Animal Welfare Act ("AWA" or "the Act"). PETA argues that such renewal process undermines a key purpose of the Act, that is, ensuring the humane treatment of animals. The district court granted the USDA's Rule 12(c) motion for judgment on the pleadings, concluding that the USDA's interpretation was owed deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Because the AWA does not directly address license renewal but does expressly authorize the USDA to promulgate and implement its own renewal standards, we affirm.

I.

PETA sued the USDA and Tom Vilsack[1] in his official capacity as Secretary of the USDA under the Administrative Procedure Act ("APA"). PETA alleges that the USDA has a "policy, pattern, and practice of rubber-stamping . . . license renewal applications" of applicants that the USDA cites for violating the AWA, some only days

---

[1] Tom Vilsack resigned in January 2017 as Secretary of the USDA. Sonny Perdue is the current Secretary of the USDA. The Act authorizes the Secretary of Agriculture, who falls within the USDA, to administer the Act. *See* 7 U.S.C. §§ 2132(b), 2151. For ease of reference, cites to "USDA" herein will encompass both the USDA and the Secretary.

3

before renewing their licenses. J.A. 5.[2]  Specifically, PETA highlights certain entities and individuals (collectively, "Exhibitors")[3] that obtained license renewals despite violating the AWA.[4]

As part of its mission to protect animals from "abuse, neglect, and cruelty," PETA asserts that it has spent resources (1) sending its members to document animal conditions at Exhibitors' facilities; (2) submitting violation reports to the USDA; and (3) disseminating information about the violations through its website, publications, and other media. J.A. 9.  PETA further asserts that by renewing Exhibitors' licenses despite their alleged repeated violations, the USDA "causes PETA to spend additional resources monitoring, documenting, and addressing the unlawful licensing decision and the

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] The Exhibitors are Summer Wind Farms Sanctuary, the Mobile Zoo, Tri-State Zoological Park, Henry Hampton, and Michael Todd.  *See* Appellant's Br. 25; *see also* J.A. 6, 17–37.

[4] The descriptions of past violations by other entities -- though not the Exhibitors here -- are particularly disturbing.  For example, a USDA-licensed puppy mill was cited for "having a dog with no teeth, his or her jaw bone partially missing with the bone exposed," and more disturbingly, having "seven dead puppies scattered on the ground at the facility."  Brief for The Humane Society of the United States as Amici Curiae Supporting Appellant at 7.  Even worse, a dog kennel passed inspection from May 2007 to the present despite having over 100 hundred pages of violations, including "emaciated dogs whose ribs, vertebrae and hip bones were protruding; dogs with wounds and lesions (some of which were red and oozing), dental disease, eye infections (some so severe that the dogs' eyes were matted shut with discharge), and injured limbs; and dogs and puppies living in 100-degree temperatures who exhibited clear signs of heat stress, including total non-responsiveness."  *Id.* at 8.  In fact, at this same kennel, some of the dogs were so ill that they had to be euthanized.  *See id.* at 9.

4

inhumane conditions at the applicants' facilities." *Id.* As a result, PETA seeks (1) a declaratory judgment that the USDA's renewal policy -- both facially and as applied to Exhibitors -- violates the APA; (2) a permanent injunction enjoining the USDA from implementing their renewal process; (3) nullification of the Exhibitors' license renewals; and (4) reasonable attorney's fees and costs. *See id.* at 40.

The district court granted the USDA's motion for judgment on the pleadings. *See People for the Ethical Treatment of Animals, Inc. v. United States Dep't of Agric.*, 194 F. Supp. 3d 404, 407 (E.D.N.C. 2016). In doing so, the district court first determined that the AWA only addressed license issuance, not license renewal, which is at issue here. *See id.* at 413. The district court next concluded that the USDA's renewal process was based on a permissible construction of the AWA because the AWA itself authorized the USDA to regulate licensing, including renewal. *See id.* at 414–15. PETA timely appealed.

II.

A.

We review de novo the district court's ruling on a motion for judgment on the pleadings under Rule 12(c), *see Butler v. United States*, 702 F.3d 749, 751–52 (4th Cir. 2012), applying the standard for a motion under Rule 12(b)(6) -- that is, such a motion should "only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in

5

support of his claim entitling him to relief," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

B.

This case tasks us with examining an "agency's construction of the statute which it administers." *Chevron*, 467 U.S. at 842. As a result, we implement the familiar framework established under *Chevron*. *See City of Arlington v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013); *Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 817 (4th Cir. 2001). At its core, that framework operates as a tool of statutory construction whereby we give plain and unambiguous statutes their full effect; but, where a statute is either silent or ambiguous, we afford deference "to the reasonable judgments of agencies with regard to the meaning of ambiguous terms [or silence] in statutes that they are charged with administering." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996). *Chevron* deference provides that "any ensuing regulation" related to the ambiguity or silence "is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). This deference is rooted in the widely understood notions that the "well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) (internal quotation marks omitted), as well as the fact that "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington*, 133 S. Ct. at 1868.

Nonetheless, *Chevron* deference is not a given. Indeed, an agency must meet certain threshold procedural requirements before courts may address *Chevron* deference, particularly notice-and-comment rulemaking. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124–2126 (2016) ("When Congress authorizes an agency to proceed through notice-and-comment rulemaking, that relatively formal administrative procedure is a very good indicator that Congress intended the regulation to carry the force of law, so *Chevron* should apply . . . . But *Chevron* deference is not warranted where . . . the agency errs by failing to follow the correct procedures in issuing the regulation" (internal quotation marks omitted)). If such procedural requirements are met, then we engage in a two part inquiry to determine whether *Chevron* deference applies. First, we must ascertain whether Congress has "directly spoken to the precise question at issue"; if Congress has done so, that ends the inquiry. *Chevron*, 467 U.S. at 842; *see Am. Online, Inc.*, 243 F.3d at 817. In assessing whether Congress has spoken to the issue, "we focus purely on statutory construction without according any weight to the agency's position," relying on the plain language of the statute as the "most reliable indicator of Congressional intent." *Sijapti v. Boente*, 848 F.3d 210, 215 (4th Cir. 2017) (internal quotation marks and citation omitted). But, if Congress has not addressed the question, we must then determine "whether the agency's answer is based on a permissible construction of the statute," *id.* at 843, that is, whether (1) the agency promulgated its interpretation via notice-and-comment rulemaking or formal adjudication, *see Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000); and (2) its "interpretation is reasonable," *Piney Run Pres. Ass'n v. Cty. Comm'rs*, 268 F.3d 255, 267 (4th Cir. 2001).

7

III.

A.

To say, as PETA asserts, that the USDA did not promulgate its interpretation via notice-and-comment, and more generally, did not adequately consider the issue of renewals is belied by the record. Indeed, the record here demonstrates that the USDA consistently engaged in notice-and-comment rulemaking with regard to issuing and renewing licenses.

For example, in 1995, the USDA engaged in notice-and-comment rulemaking regarding its license renewal process, and one commenter specifically questioned the renewal application's certification of compliance, suggesting that simply certifying compliance "would be ineffective" in ensuring actual compliance by a licensee. Animal Welfare, Licensing and Records, 60 Fed. Reg. 13,893, 13,894 (Mar. 15, 1995). The USDA responded that though licensees certify their compliance during renewal, the certification does not "take the place of inspections" by the USDA. *Id.* And during this same notice-and-comment period, the USDA received additional comments related to altering its renewal process. The USDA considered and responded to each comment. *See id.* at 13,893–13,894.

More recently, in 2000, the USDA began a notice-and-comment period that culminated in a final ruling in 2004. Toward that end, "[the USDA] published in the Federal Register . . . a proposal to amend the regulations by revising and clarifying . . . the procedures for applying for licenses and renewals." Animal Welfare, Inspection, Licensing, and Procurement of Animals, 69 Fed. Reg. 42,089, 42,089 (July 14, 2004).

8

The USDA "solicited comments concerning [its] proposal for 60 days ending on October 3, 2000," and at "the request of several commenters, [] extended the comment period to November 20, 2000," and ultimately received 395 comments. *Id.* During the notice-and-comment period, a commenter questioned the renewal process, suggesting that the USDA should deny renewal unless the subject licensee "was inspected and found compliant just prior to the renewal date." *See id.* at 42,094. The USDA responded to the comment in its 2004 final ruling, stating that it enforces the AWA through "random, unannounced inspections to determine compliance," and that after inspections, "all licensees are given an appropriate amount of time to correct any problems and become compliant." *Id.* Based on its enforcement methods and the nature of citations, the USDA concluded, "[i]t is unrealistic and counterproductive to make license renewal contingent on [the applicant] having [no] citations." *Id.* The USDA thus declined to alter its renewal process. *See id.*

Nonetheless, PETA urges us to discount the USDA's response in its 2004 final ruling, arguing that the response was posted in a final ruling, and so provided an insufficient opportunity for public comment. But this position ignores the full scope of the notice-and-comment proceedings. The 2004 final ruling was based on a notice-and-comment period spanning four years, beginning in 2000. As indicated in the 2004 final ruling, the USDA accepted a wide array of comments, some related to the proposed changes and others unrelated. In fact, the USDA specifically considered the alternative renewal process for which PETA argues today -- that renewal should be denied unless a licensee passes inspection at the time of renewal -- but determined that the proposed change would be "unrealistic and counterproductive" to its enforcement efforts. Animal

9

Welfare, Inspection, Licensing, and Procurement of Animals, 69 Fed. Reg. 42,089, 42,089 (July 14, 2004).

B.

*Chevron*: Step One

Because the USDA has properly engaged in notice-and-comment rulemaking, we turn to the first step of *Chevron*, which requires us to determine if Congress has spoken to the issue of whether the USDA may renew a license even though the licensee has violated the Act or the USDA's regulations.

1.

Congress passed the AWA in 1966 to regulate the research, exhibition, and sale of animals, as well as to assure their humane treatment. *See* 7 U.S.C. § 2131. The USDA is authorized to promulgate rules and regulations as to those matters. *See id.* § 2151; *see also* § 2143(a)(1)–(2). An animal exhibitor must obtain a license from the USDA. *See id.* § 2134. Per the AWA, the USDA "shall issue licenses . . . in such form and manner as [the USDA] may prescribe and upon payment of such fee," but not until the licensee demonstrates that "his facilities comply with the standards promulgated" by the USDA. *Id.* § 2133. Pursuant to the standards promulgated by the USDA, an initial license requires applicants to (1) be 18 years of age or older, *see* 9 C.F.R. § 2.1(a)(1); (2) apply using a particular form and file it with the appropriate personnel, *see id.*; (3) pay an application fee, *see id.* § 2.6(a); and (4) acknowledge receipt of and agree to comply with the USDA's regulations and standards, *see id.* § 2.2(a). Applicants for initial licenses

10

must also be inspected and demonstrate compliance before such license will be issued. *See id.* § 2.3(b).

The USDA also has discretion to investigate or inspect a licensee's facilities as it "deems necessary" for violations of the AWA or USDA regulations. 7 U.S.C. § 2146(a). Any interested person may notify the USDA about suspected violations of the AWA as long as he or she is not a party to "any proceeding which may be instituted" as a result of that notification. 7 C.F.R. § 1.133(a)(4); *see id.* § 1.133(a)(1), (3). The USDA has discretion to investigate those suspected violations. *See id.* § 1.133(a)(3). If the USDA believes a licensee has violated the AWA or its regulations, then it may suspend the license for up to 21 days, and may, after notice and an opportunity to be heard, suspend the license for a period greater than 21 days or revoke the license. *See* 7 U.S.C. § 2149(a).

An application to renew a license must be filed within 30 days prior to the license expiration date. *See* 9 C.F.R. § 2.7(a). To achieve renewal, an applicant must satisfy three administrative requirements promulgated by the USDA: (1) file an annual report indicating the number of exhibited animals the applicant owns or leases, *see id.* § 2.7(a), (d); (2) pay an annual license fee, *see id.* § 2.1(d)(1); and (3) certify "by signing the application form that, to the best of the [applicants'] knowledge and belief, [they are] in compliance with the regulations and agree[] to continue" to so comply, *id.* § 2.2(b). Of note, proof of actual compliance is not necessary for license renewal. *See id.*

11

2.

PETA argues that the USDA's interpretation of the AWA to renew licenses despite outstanding violations of the Act at the time of renewal should not receive *Chevron* deference because the term "issue," as used in § 2133, encompasses both license issuance *and* renewal; therefore, Congress has directly addressed whether the USDA may renew a license despite recent violations. If PETA's position is correct, then licensees would have to demonstrate that their facilities "comply with the standards promulgated" by the USDA not only at the time a license is issued, but also at the time of renewal. 7 U.S.C. § 2133. Thus, PETA argues that because Congress has directly spoken to the issue of renewal, our inquiry should end, and we should conclude that the USDA's renewal of Exhibitors' licenses despite their alleged noncompliance violates § 2133.

3.

PETA's argument cuts against principles of statutory construction. To begin, as a basic principle, we look to the statutory text, and absent a different definition, we interpret statutory terms "in accordance with their ordinary meaning." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013). Here, the word "renew" does not appear in the AWA but the word "issue" does, though it is undefined. But the plain meaning of each of these terms leads to the conclusion that the term "issue" does not encompass "renew" as used in the AWA. *See Animal Legal Def. Fund v. United States Dep't of Agric.*, 789 F.3d 1206, 1216 (11th Cir. 2015) (using Webster's Dictionary while examining the AWA to find that "issue" is defined as "to come out, go out" and renew is defined as "to make new again, to restore fullness or sufficiency" (internal quotation marks omitted)).

12

4.

PETA also looks to the USDA regulatory actions, particularly those promulgated in 1989, to argue that we need not proceed to step two of *Chevron*. In particular, PETA contends that the USDA at one point supported PETA's argument that the term "issue" applies to both license issuance and renewal. Before 1989, 9 C.F.R. § 2.3(a) stated, "Each applicant must demonstrate that his or her premises . . . comply with the regulations and standards set forth in parts 2 and 3 of this subchapter *before a license will be issued*" (emphasis supplied). In a proposed rule filing, the USDA stated that it planned to revise § 2.3(a) by removing the words "'before a license will be issued' from the requirement because it applies to both initial licenses and license renewals." Animal Welfare, 54 Fed. Reg. 10835, 10840 (Mar. 15, 1989). PETA latches onto this language to argue that Congress intended 7 U.S.C. § 2133 of the AWA to apply to both issuance and renewal.

PETA overstates the significance of this point. Critically, the relevant language of 7 U.S.C. § 2133 of the AWA has remained the same since 1966. *See* Pub. L. No. 89-544, § 3, 80 Stat. 350, 351 (1966) (containing the same text without mention of renewal). And nothing in the regulatory activity cited by PETA limits or modifies the broad discretion granted to the USDA in implementing the AWA, thus reinforcing an apparent intent to authorize the USDA to develop appropriate licensing procedures as it sees fit.

C.

*Chevron*: Step Two

Given the plain language of the AWA, it is clear that it does not specifically address the renewal question at issue here. The Act is not only silent as to renewal, but is also ambiguous as to whether the term "issue" refers to license issuance and renewal. As a result, we move to step two of the *Chevron* analysis -- whether the USDA's interpretation of the renewal process is a permissible one.

A permissible interpretation is one that an agency has promulgated through notice-and-comment rulemaking or formal adjudication, and is one that is reasonable. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000); *Piney Run Pres. Ass'n v. Cty. Comm'rs*, 268 F.3d 255, 267 (4th Cir. 2001). Whether the USDA's interpretation here is reasonable requires us to determine whether the USDA's "understanding" of the AWA "is a sufficiently rational one to preclude a court from substituting its judgment" for that of the agency. *Chem. Mfrs. Ass'n. v. Nat. Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985). Critically, we are also mindful that "a very good indicator of delegation meriting *Chevron* treatment [is] express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).

Reasonable Interpretation

Having determined that the USDA's interpretation of the renewal process was promulgated via notice-and-comment rulemaking, we turn to whether that interpretation is reasonable. As previously stated, the reasonableness inquiry requires us to determine whether the USDA's "understanding" of the AWA "is a sufficiently rational one to preclude a court from substituting its judgment" for that of the agency. *Chem. Mfrs. Ass'n*, 470 U.S. at 125. In this regard, we are mindful that, pursuant to § 2151, Congress has expressly delegated the authority to interpret the AWA to the USDA. As a result, we afford the USDA interpretation controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute. *See Chevron*, 467 U.S. at 843–44; *see also Mead Corp.*, 533 U.S. at 229. Therefore, we examine whether the USDA's construction of the AWA is reasonable given the policies that the AWA commits to the care of the USDA. If they are reasonable, we "should not disturb [the USDA's interpretation] unless it appears from the statute or its legislative history that the [interpretation] is not one that Congress would have sanctioned." *Chevron*, 467 U.S. at 845 (quotation marks omitted); *see also Knox Creek Coal Corp. v. Sec'y of Labor*, 811 F.3d 148, 158–59 (4th Cir. 2016).

PETA questions the reasonableness of the USDA's interpretation, contending that the licensing regime undermines the purpose of the AWA to ensure the humane treatment of animals. According to PETA, any infraction at the time of renewal should result in

license denial, if not revocation. PETA's premise is that renewal must be conditioned upon full compliance. This argument falls short on two fronts.[5]

1.

Enforcement of the Act

First, on the enforcement front, PETA's proposed interpretation could actually result in a more inhumane renewal regime. The USDA conducts spot checks of licensees throughout the year. This encourages year round compliance by licensees. If, however, the USDA only inspected at the time of renewal, that could motivate licensees to clean up their act closer to the renewal date while relaxing compliance throughout the rest of the year.

---

[5] PETA also argues that we should not defer to this interpretation because the USDA allegedly took inconsistent positions in prior litigation. PETA relies on two prior cases: (1) *Ray v. Vilsack*, No. 5:12-cv-212, 2013 WL 5561255 (E.D.N.C. Oct. 8, 2013); and (2) *Animal Legal Def. Fund*, 789 F.3d at 1221. In *Ray*, while discussing § 2133, PETA claims that the USDA stated the Act was ambiguous as to "how an applicant for renewal may demonstrate compliance with the AWA." Appellant's Br. 14. PETA interprets that statement to mean the USDA conceded that § 2133 applies to both issuance and renewal. *See id.* at 13. However, that statement by the USDA was made in a reply brief supporting its motion to dismiss and in the context of discussing whether the renewal process is subject to judicial review. In *Animal Legal Def. Fund*, PETA claims that a USDA official sent a letter about why the USDA renewed an animal exhibitor's license despite violations. The letter allegedly stated that the USDA renewed the license because it found the animal exhibitor was "in compliance with the regulations and standards, and none of the other criteria for a license denial under [9 C.F.R. §§ ]2.11 or 2.12 are applicable." *Id.* at 16. PETA believes the USDA "appeared to acknowledge that before renewing a license it must determine that the applicant is in compliance with the regulations and standards." *Id.* (internal quotation marks omitted). The point is that contrary to PETA's assertion, the USDA has consistently asserted that § 2133 license issuance requirements do not apply to renewals.

Further, PETA overlooks the fact that under the current USDA regime, though a licensee may falsely certify that it is in compliance when applying for renewal, that does not mean the USDA turns a blind eye to future compliance. As the USDA acknowledges, certifying compliance on a renewal application does not act "as an alternative means of ascertaining compliance or as a substitute for inspections." Animal Welfare, Licensing and Records, 60 Fed. Reg. 13893, 13894 (Mar. 15, 1995). The USDA retains discretion to investigate licensees "as [it] deems necessary," § 2146(a), and renewing a license does not foreclose future suspension or revocation for violations. In fact, the USDA's own regulations permit termination of a license after notice and an opportunity for a hearing "during the license renewal process." 9 C.F.R. § 2.12.

2.

Discretion to the USDA

Whether PETA agrees with the USDA's renewal process or not, the authority to implement the renewal process is a policy decision that Congress has delegated to the USDA. Indeed, the AWA is rife with examples of Congress granting the USDA significant discretion with regard to the issuance of licenses, when and how to determine whether a violation occurred, and how to reprimand violators. *See, e.g.*, 7 U.S.C. §§ 2133 (the USDA issues licenses "in such form and manner as [it] may prescribe"); *id*. § 2146(a) (the USDA "shall make such investigations or inspections as [it] deems necessary" to determine whether a licensee has violated the AWA); *id*. § 2149(a) (the USDA, upon reason to believe a licensee has violated the AWA, "may suspend such person's license temporarily" for up to 21 days, and may suspend for longer and

17

ultimately revoke a license after providing notice and opportunity for a hearing). Ultimately, the AWA establishes a discretionary regime under which the USDA administers the Act with considerable, express authority.

D.

Finally, it is worth noting that this case is almost identical to *Animal Legal Defense Fund v. United States Dep't of Agriculture*, 789 F.3d 1206 (11th Cir. 2015). Though we are not bound by the law of other circuits, we are aware of the "importance of maintaining harmony among the Circuits on issues of law" where feasible, *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010) (internal quotation marks omitted), particularly in cases that could affect long-standing, nationwide regulatory schemes.

In *Animal Legal Defense Fund*, the appellant, as PETA does here, sought declaratory and injunctive relief against the USDA for renewing a license even though the licensee had violated the AWA. *See* 789 F.3d at 1212. In that case, the district court granted summary judgment to the USDA, concluding the USDA's interpretation should be accorded *Chevron* deference. *See id.* at 1212–13. The Eleventh Circuit affirmed. Under step one of *Chevron*, the Eleventh Circuit determined that Congress had not spoken to the issue, relying on a dictionary definition of the terms and the fact that the term "renew" neither appears nor is defined in the AWA. *See id.* at 1216. Turning to step two, the Eleventh Circuit highlighted the fact that Congress expressly delegated authority to the USDA to interpret § 2133. The court further concluded that the USDA's interpretation of the renewal process was reasonable because it soundly balanced the competing goals of animal welfare and due process for licensees, and that the USDA

18

retained the authority, even after renewal, to suspend or a revoke a license. *See id.* at 1224.

Ultimately, the Eleventh Circuit held, the "AWA licensing regulations embody a reasonable accommodation of the conflicting policy interests Congress has delegated to the USDA" and "are entitled to *Chevron* deference." *Id.* We agree.

## IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.